**GIW INDUSTRIES, INC.,**
**Plaintiff–Appellee,**

v.

**TREVOR, STEWART, BURTON & JACOBSEN, INC., Defendant–Appellant.**

No. 89–8262.

United States Court of Appeals,
Eleventh Circuit.

March 1, 1990.

---

**730**

Melvin Hutson, Greenville, S.C., Mark E. Brossman, Chadbourne & Parke, New York City, Oscar N. Persons, Alston & Bird, Atlanta, Ga., for defendant-appellant.

John I. Harper, Fulcher, Hagler, Reed, Obeshain, Hanks and Harper, Augusta, Ga., for plaintiff-appellee.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from the judgment of the district court in favor of plaintiff GIW Industries, Inc. (GIW) on its claim against Trevor, Stewart, Burton & Jacobsen, Inc. (Trevor Stewart) for breach of fiduciary duty and contract. GIW alleges that Trevor Stewart failed prudently to provide investment management services for plaintiff's profit-sharing plan, in violation of § 404(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1104(a)(1).

## I. FACTS

The following relevant facts are not in dispute. Plaintiff GIW maintains a Salaried Employees Profit–Sharing Plan ("Plan") for the benefit of its employees, which consists of three funds, Fund A, Fund C and Fund D. Fund A is an asset allocation account invested in fixed income securities, equities of publicly traded companies and money market instruments. The accounts of the individual participants of Fund A are not segregated and cannot be separately invested. Fund C is invested in South African Krugerrand gold coins; no new investments are permitted in Fund C, but participants who previously invested in Fund C may retain their investments in that fund. Fund D is invested in maximum-security, short-term United States Treasury bills. Plan participants determine how their balance is allocated between funds and may change their investment election once annually. When participants' employment with GIW ends, they may receive either partial or full value of their accounts. Participants may also withdraw their funds from the Plan one time during a Plan year.

In June 1986, GIW hired Trevor Stewart to provide investment management services for GIW's Fund A.[1] Trevor Stewart had adopted a strategy in 1982 to invest clients' assets primarily in long-term government

---

1. Just prior to 1986, Fund A was an individually directed account plan managed by the Fidelity Group.

bonds, which were highly liquid and carried a minimal credit risk. The stock market was in a period of high risk and uncertainty, and Trevor Stewart expected interest rates, which were high compared to inflation, to decline so that the value of long-term bonds would appreciate. Trevor Stewart maintained this investment strategy, with minor revisions, throughout the time it served as investment manager for GIW.

GIW was a named fiduciary in its profit-sharing plan, and pursuant to its contract with Trevor Stewart, GIW delegated to Trevor Stewart the sole authority to manage the investment of Fund A's assets. When Trevor Stewart assumed its duties as investment manager and fiduciary of Fund A, the fund had a value of $1,859,234.86. Trevor Stewart divided the Fund A portfolio as follows: 70 percent in long-term government bonds, 15 percent in zero coupon bonds (strips), 10 percent in stocks, and 5 percent in cash.

By letter dated March 19, 1987, GIW notified Trevor Stewart of a required cash disbursal of approximately $386,600 to be made from Fund A on June 1, 1987. On May 31, 1987, Trevor Stewart sold for $340,000 United States Treasury bonds from Fund A which had cost $396,312.50. On September 25, 1987, Trevor Stewart sold for $76,625 bonds which had cost $99,-078.13.

In October 1987, GIW terminated the contract with Trevor Stewart effective November 2, 1987. The district court found that the value of Fund A at that time was $1,112,117.52.[2] GIW had paid Trevor Stewart $17,031.54 in fees.

GIW filed suit against Trevor Stewart, alleging that it failed to provide for liquidity so that payments could be made to retiring employees without adversely affecting Fund A; that in order to cash out retiring employees it was necessary to sell the Treasury bonds Trevor Stewart had purchased; and that a loss to the fund resulted. Plaintiff further alleged that defendant failed to diversify the investments of

the fund to minimize the risk of large losses, as required by ERISA.

Defendant filed a motion for summary judgment which the district court denied by order dated February 6, 1989. After a one-day bench trial, the district court held that defendant failed to investigate the particular cash requirements of Fund A and to diversify the investments of Fund A's assets in light of Fund A's cash withdrawal requirements. Based on one of the model portfolios constructed by GIW's expert, the court awarded damages of $554,031.54, which included disgorgement of management fees. This timely appeal followed.

## II. DISCUSSION

### A. *Fiduciary Duty*

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), sets forth the standard of prudence to which Trevor Stewart was held as fiduciary of Fund A. That section provides that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use....

29 U.S.C. § 1104(a)(1)(A) and (B). Furthermore, a fiduciary must diversify the investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). The district court found that Trevor Stewart failed to investigate the particular cash flow requirements of Fund A and therefore did not adequately diversify the investment of Fund A's assets, in breach of its fiduciary duty under ERISA. We agree.

The district court found that at no time did a Trevor Stewart representative obtain or read relevant Plan documents or the Plan booklet prior to investing Fund A's assets. Trevor Stewart did not determine the historical cash flow needs or investi-

---

**2.** Appellant contends that no evidence was presented to support this figure; appellant values the fund as of November 30, 1987 at $1,301,-409.

gate prior or anticipated withdrawal patterns of Fund A.

The district court also found that in early 1986, John Hagler, III, a principal stockholder, director and officer of GIW, met with Ray Burton, a Trevor Stewart director and principal stockholder, to discuss retaining Trevor Stewart, and that Hagler conveyed at that time his intention of retiring from the company and withdrawing his sizeable share of assets from Fund A.

Evidence was introduced at trial of historical data about Fund A and the Plan, employer and employee contributions, and distributions and withdrawals; all of this information was readily available to Trevor Stewart from GIW headquarters. The withdrawals occurring in 1987 which prompted this litigation were in fact quite consistent with the historical withdrawal information. There is evidence in the record that Mr. Burton told GIW's Manager of Personnel, Mary Wells, about Trevor Stewart's need to be advised of impending cash withdrawals and disbursal requirements; Wells testified that the precise withdrawal or disbursal requirements were unpredictable. Appellant's counsel acknowledged at oral argument, however, that Trevor Stewart did nothing to ascertain expected withdrawals from Fund A when it agreed to handle GIW's money.

Trevor Stewart's expert, Frank S. Smith, Jr., testified that an investment manager should determine its client's past needs for cash flow. When asked whether that would be the prudent thing to do, Mr. Smith replied: "Well, I think any information that's helpful in the investment process should be determined where it is available." He also agreed that it would be helpful for an investment manager to know the general makeup of the plan participants, such as their age and likelihood of retirement. Mr. Smith opined that both the client and the investment manager were responsible for determining the client's needs and objectives. The questioning continued:

Q: But isn't it incumbent upon the investment manager to go and get that information, to ask for it, to determine it, to draw it out, if it is not volunteered?

A: He should certainly seek as his part to find any information that he can; yes, sir.

Q: And that would be the prudent thing to do, wouldn't it?

A: I would think so; yes, sir.

Q: And to not do that would be imprudent, wouldn't it?

A: I would think so, yes, sir.

The district court credited additional expert testimony that it would be imprudent for an investment manager to fail to investigate potential cash withdrawals before structuring an investment such as the one here.

The decision to buy long-term bonds was the investment strategy in place at Trevor Stewart when it became the investment manager for Fund A. Trevor Stewart's decision to invest in 30–year bonds for GIW was not a decision which was specific to GIW. According to Mr. Burton, "GIW Fund A reflected the investment posture in all [Trevor Stewart's] retirement trust accounts where there were no restrictions as to what investments should be used."

Appellant maintains, however, that its investments in long-term government bonds were prudent at the time they were made because they were based upon solid market analysis. Indeed, the evidence shows that investment in long-term government bonds, although a position in the minority among investors at that time, was viewed by many as a sound strategy. But the prudence of the investment of the assets in question cannot be analyzed in the abstract. Appellant had a duty to act solely in the interest of the participants of Fund A. The district court did not examine Trevor Stewart's investment strategy from the vantage point of hindsight, as appellant argues, but properly viewed the investment decision in light of the anticipated needs of the fund for which appellant was a fiduciary; such information was available and should have been sought by appellant. Thus, even though appellant investigated market conditions before making its investment decision, it did not employ the proper

methods to structure the investment to fit the specific needs of Fund A. *See Donovan v. Mazzola,* 716 F.2d 1226, 1232 (9th Cir.1983) (the question is whether the trustees, at the time they engaged in the challenged transactions, "employed the appropriate methods to investigate the merits of the investment and to structure the investment"), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984).

The district court correctly concluded that because of appellant's failure to investigate the cash flow needs of Fund A, it did not acquire sufficient information from which it could decide whether there was any need to diversify the assets of Fund A. *See Fink v. National Savings & Trust Co.,* 772 F.2d 951, 962 (D.C.Cir.1985) (Scalia, J., concurring in part and dissenting in part) ("It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former, tending to show that the trustee *should have known* more than he knew.") (emphasis in original). Although the government securities were liquid and carried minimal credit risk, the needs of Fund A required potential cash withdrawals and disbursals also to be considered, which appellant failed to do. If appellant had investigated the age and projected retirement plans of employee participants, it could have anticipated the need for cash and for a sale of assets to fulfill that need.

Trevor Stewart invested 70% of the assets of Fund A in United States Treasury bonds with a 30–year maturity. Expert testimony established that long-term bonds are subject to a greater degree of price volatility than shorter-term bonds, which exposed the fund to greater risk if the bonds needed to be sold prior to maturity than would have been the case had the assets been invested in shorter-term bonds or bonds with varying, or staggered, maturity dates. Because of the price volatility in the market for long-term bonds and the substantial proportion of assets invested in these bonds, Fund A was exposed to greater risk of cash outflows than was prudent. There is ample evidence in the record that such undue risk could have been avoided by staggering maturity dates. The district court thus correctly concluded that appellant failed to diversify, as was required of a prudent investment manager.

However, appellant further avers that the diversification must be measured by considering the assets of the entire plan, not simply the assets of Fund A. It is undisputed, though, that Trevor Stewart exercised no control over any fund other than Fund A. Moreover, Fund A could not draw upon the other funds for the purpose of cash pay-outs. Even if the entire plan were to be considered in determining whether the diversification requirement has been met, Trevor Stewart made no investigation of the other funds, either. Mr. Burton, whose testimony the district court credited, declared that the existence of Fund D did not influence how Trevor Stewart invested the assets of Fund A. Mr. Burton agreed that Trevor Stewart did not rely on the availability of "ready cash" in Fund D because, as he stated, Trevor Stewart was "not charged with any responsibility for Fund D."

### B. *Damages*

■ Appellant is liable as a fiduciary for any losses resulting from its breach and is subject to "such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a). In awarding damages, the trial court accepted as reasonable one of the model portfolios presented by plaintiff's expert, Dr. Andrews. This model portfolio included an investment of 35% in long-term bonds and 35% in intermediate-term bonds. Dr. Andrews concluded that, had the investments been made in bonds with staggered maturity dates as in the model, Fund A would have been worth $1,649,000 as of October 31, 1987, instead of $1,112,000, its actual value. The court awarded GIW the difference of $537,000. *See Donovan v. Bierwirth,* 754 F.2d 1049, 1057 (2d Cir.1985) ("The question of loss to the Plan ... requires a comparison between the actual performance of the Plan and the performance that otherwise would have taken place").

Appellant raises numerous objections to the damages award. Appellant claims that the district court abused its discretion in refusing to bifurcate the proceeding into liability and damage phases, and that a hearing on damages was warranted. As a result, appellant argues, the parties did not have the opportunity adequately to address the issue of damages, which prejudiced Trevor Stewart. Appellant further contends that, as to the model upon which the district court chose to base the measure of damages, no evidence was presented to support the expert's valuations of the Fund, the calculation of the portfolio's market value indicates that Dr. Andrews failed to subtract all withdrawals and transfers, resulting in an overstated loss sustained by Fund A, and Dr. Andrews did not specify the maturity dates, interest rates, and dates of purchase and sale of the investments in the model.

In the pre-trial order, the parties stated that a bifurcated trial would not be of assistance in this case. Thereafter, during the trial, plaintiff offered the testimony of its expert witness regarding the effect laddering would have had on the Fund. Trevor Stewart had the opportunity to rebut plaintiff's evidence at trial, but the evidence stood unrebutted.

At the close of the trial, the district court gave the parties the opportunity to provide additional assistance to the court on the issue of damages. Appellant's post-trial filing contained a "Supplemental Discussion of Damages," in which it merely contended that if damages are appropriate, they could be computed by reconstructing the daily course of any particular investment during the period in question, to be compared with defendant's investments. Trevor Stewart acknowledged in its submission that the district court "has absolute authority to direct these parties to submit further evidence regarding damages." Trevor Stewart thus recognized that the district court had the discretion to require further presentation of evidence; however, defendant neither requested an evidentiary hearing in its post-trial papers nor filed a motion seeking one.

We see no reason to fault the district court for exercising its discretion, which it did not abuse, in accepting the measure of damages presented by plaintiff's expert. As the district court noted in its decision, "Trevor Stewart presented no additional evidence, no analysis of evidence already presented, and no discussion of relevant legal authorities."

We find any additional contentions by appellant to be without merit.

Accordingly, the judgment of the district court is AFFIRMED.